# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:19-cv-00032-MR

BRADLEY L. MAUNEY,      )
                                  )
           Plaintiff,     )
                                  )     **MEMORANDUM OF**
     vs.                   )     **DECISION AND ORDER**
                                  )
BURKE-CATAWBA DISTRICT  )
CONFINEMENT FACILITY,    )
et al.,                      )
                                  )
           Defendants.   )
_____ )

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment. [Doc. 29].

## I.    PROCEDURAL BACKGROUND

On January 30, 2019, the Plaintiff Bradley L. Mauney, proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq.; and Section 504 of the Rehabilitation Act ("Rehab Act"). [Doc. 1]. Plaintiff alleges that his rights under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution and under the ADA and Rehab Act were violated while Plaintiff was being held at Defendant Burke-Catawba District Confinement Facility ("BCDCF")

on August 28, 2018.[1]  [Id. at 3-4].  Plaintiff's Complaint survived initial review as to Defendants BCDCF, on Plaintiff's ADA and Rehab Act claims only; FNU Bollinger, identified as Corporal Detention Officer at BCDCF; and FNU Marshall, identified as a Sergeant Detention Officer at BCDCF.  [Doc. 1 at 3].  Plaintiff sues Bollinger and Marshall in their individual and official capacities.  [Id.].

Plaintiff alleges that he is deaf and had been transported from the Guilford County Detention Center to BCDCF for a court appearance.  Plaintiff claims that, while at BCDCF and confined in a holding cell, he was denied access to the TTY telephone.[2]  [Doc. 1 at 6].  Plaintiff further alleges that, after being denied access to the TTY telephone, Defendants Bollinger and Marshall used excessive force on Plaintiff.  [Id. at 6-7].

For his injuries, the Plaintiff alleges that he suffered swelling, bruises, and pain in his left leg.  [Id. at 8].  For relief, the Plaintiff seeks compensatory

---

[1] Plaintiff filed his Complaint under penalty of perjury.  [See Doc. 1-1].

[2] TTY stands for Text Telephone, which is a special device that allows people who are deaf, hard of hearing, or speech-impaired to type messages back and forth.  BCDCF had a TTY telephone located in a slide-out desk right under the standard telephone for use by deaf inmates like Plaintiff.  [Doc. 30-3 at 8, 26: Plaintiff's Dep.].  Plaintiff had used the TTY telephone at BCDCF on a previous occasion in November 2016 after he had been arrested.  [Id. at 2].

and punitive damages and injunctive relief requiring Defendants to provide TTY telephones to all deaf inmates.[3] [Id. at 5].

On August 10, 2020, Defendants filed a Motion for Summary Judgment. [Doc. 29]. All defendants argue that they are entitled to summary judgment because Plaintiff failed to exhaust available administrative remedies before bringing this suit and because Plaintiff's claims fail on the merits. Defendants Bollinger and Marshall also argue that they are entitled to qualified immunity on Plaintiff's individual capacity claims. [Doc. 30 at 2, 23].

Thereafter, the Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 31]. The Plaintiff was specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [Id. at 2]. Rather, he must support his assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

---

[3] Plaintiff has been released from custody since filing his Complaint. [See Doc. 27]. As such, Plaintiff's claim for injunctive relief will be dismissed as moot. See Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007).

3

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. (citing Fed. R. Civ. P. 56(c)(1)(a))]. The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 3-4 (citing Fed. R. Civ. P. 56(c)(4))]. Despite obtaining an extension to respond to Defendants' summary judgment motion, Plaintiff has filed nothing in response. [See Doc. 32; 9/1/2020 Docket Entry]. Because Plaintiff's Complaint was submitted under penalty of perjury, however, it is considered an affidavit for summary judgment purposes. See Goodman v. Diggs, No. 18-7315, 2021 WL 280518, at *4, --- F.3d --- (4th Cir. 2021) (holding the district court erred in failing to consider a prisoner plaintiff's verified, though superseded, complaints as affidavits on summary judgment). The Court will, therefore, consider its evidentiary value here. Id.

This matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). The nonmoving

party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.   FACTUAL BACKGROUND

The forecast of evidence in the light most favorable to the non-movant is as follows:

On August 28, 2018, Plaintiff was transported from Guildford County Detention Center to the BCDCF.  He arrived at BCDCF at approximately 7:00 p.m. and was placed in a booking holding cell with twelve other men.  [Doc. 1 at 6].  Each man had a chance to use the telephone.  [Id.].  When Plaintiff thought it was his turn to use the telephone, he tapped on the glass to get Bollinger's attention.  Bollinger looked at Plaintiff, who motioned "phone" with his hands.  Bollinger motioned "one-minute" in response, but in a manner

6

that reflected it would be a while. [Doc. 30-3 at 9-10]. Plaintiff sat down and "waited until it was [his] turn." [Id. at 10].

After some time, Plaintiff pressed the button requesting that the cell door be opened electronically by an officer. [Doc. 1 at 6; Doc. 30-3 at 7, 10: Plaintiff's Dep.]. After the holding cell door was opened, Plaintiff walked out of the holding cell, told Defendants Bollinger and Marshall that he is deaf, and signed "telephone" with his hands. [Id.; Doc. 30-3 at 7-8]. Bollinger said, "no," and told Plaintiff to get back into the holding cell. Plaintiff ignored Bollinger's order and kept signing "telephone" to Defendants. Bollinger then came around the desk and started to push Plaintiff back into the cell. Plaintiff said, "No, I want to use the tty."[4] [Id.; see Doc. 30-3 at 11-12]. Plaintiff then pushed Bollinger's hands from Plaintiff's body. [Doc. 30-3 at 13]. Bollinger and Marshall then turned Plaintiff around, "slammed handcuffs on [his] hands too tight" and escorted him down the hallway to a padded cell. [Id.; see Doc. 30-3 at 13-14]. BCDCF Officer Greene also assisted in escorting Plaintiff to the padded cell. [Doc. 30-5 at ¶ 7: Marshall Dec.].

---

[4] In his deposition, Plaintiff testified that he "was frustrated" because he "needed to make [his] phone calls" so that he could get out of jail. [Doc. 30-3 at 12]. Plaintiff was not a detainee but was merely at BCDCF to attend a court appearance. As such, there was no phone call Plaintiff could have made that could have prompted his release.

Once to the padded cell and before entering, Plaintiff tensed his body but did cooperate and enter the cell. [Doc. 30-3 at 16-17]. Once in the padded cell, Bollinger and Marshall lead Plaintiff to the corner of the cell and then removed his right handcuff. [Doc. 1 at 6; Doc. 30-3 at 17]. Plaintiff again signed that he wanted to use the telephone. Defendants became aggravated and shoved Plaintiff down to the floor and slammed his head against the wall. [Id.; Doc. 30-3 at 17-18]. Marshall immediately sprayed a "short burst" of mace in Plaintiff's eyes.[5] [Id.; Doc. 30-3 at 19]. Bollinger then slammed Plaintiff's head against the wall and "started slapping and punching at the side of [Plaintiff's] head and then started stomping and kicking [his] left leg and feet" while Plaintiff was on the floor. [Id. at 7]. Bollinger also applied "Mandibular Angle Nerve pressure" behind Plaintiff's right ear. Bollinger then removed the handcuff from Plaintiff's left hand. [Id.]. Plaintiff stood up. Marshall pointed a taser in Plaintiff's face and ordered Plaintiff to remove his clothes. Plaintiff complied and "kind of threw [the clothes]" at Marshall. [Id.; Doc. 30-3 at 18-20]. Plaintiff acknowledged that when his right handcuff was removed and he gestured to use the phone again, Defendants may have misunderstood and believed he was acting aggressively. [Doc. 30-3 at 18].

---

[5] Marshall testifies that it was Officer Greene, not Marshall, who deployed the pepper spray to gain Plaintiff's compliance. [Doc. 30-5 at ¶ 9].

Plaintiff remained in the padded cell for approximately five hours. He made numerous requests for a shower and drinking water to clean the pepper spray off his face. These requests were refused. [Doc. 1 at 7]. Around 1:00 a.m., Bollinger escorted Plaintiff out of the padded cell and to the shower so Plaintiff could clean his face. Bollinger then moved Plaintiff to an isolated cell until his court appearance that day. [Id.; Doc. 30-3 at 21]. Plaintiff was placed in a segregation cell because he was charged with violating various BCDCF rules of conduct relating to "his assault" and "failure to follow orders." [Doc. 30-4 at ¶ 16: Bollinger Dec.]. Inmates in segregation cells are not allowed use of a phone. Inmates in segregation are, however, allowed to file grievances. [Id.]. At no point was Plaintiff denied use of the TTY telephone because of a discriminatory purpose. [Id. at ¶ 17]. Plaintiff was simply required to wait his turn like other inmates. Having more than one inmate out of the holding cell using the phone at a time would have created a security risk and disrupted the orderly booking process. [See id. at ¶ 18].

After his court appearance, Plaintiff was returned to BCDCF. He asked again to use the TTY telephone. His request was refused. He was returned to a segregation cell, where his requests to use the TTY telephone were again denied. [Doc. 1 at 8]. On August 30, 2018, Plaintiff was transported

9

to Craven Correctional Institution. [Id.]. Plaintiff immediately went to the medical area and saw a nurse regarding his injuries. [Id.].

BCDCF had a grievance policy at the relevant times.[6] Pursuant to the grievance policy, an inmate "may request a grievance from the respective hallway officer." [Doc. 30-7 at 2]. The inmate is to complete the form, including information regarding the complaint, whether the grievance is a first complaint or an appeal to a grievance response, and the relief sought by the inmate. [Doc. 30-7 at 2-3]. All grievances are first addressed by the Sergeant, or if not available, the Corporal. If the inmate is dissatisfied by the initial response, the inmate may appeal the grievance response to the Lieutenant. Finally, an inmate may appeal the Lieutenant's decision to the facility Administrator/Major. Copies of the response are given to the inmate at each level. [Doc. 30-7 at 2].

In his sworn Complaint, Plaintiff acknowledged that his claim arose while he was confined at the BCDCF. [Doc. 1 at 9]. Plaintiff alleged that he "[did] not know" whether the facility had a grievance procedure or whether such procedure covered some or all his claims. [Id.]. Plaintiff admitted that he did not file a grievance regarding the facts giving rise to his claims here

---

[6] BCDCF closed on December 31, 2019. [Doc. 30-6 at ¶ 2: Hensley Dec.]. Again, Plaintiff filed his Complaint in this matter nearly 11 months earlier on January 30, 2019. [Doc. 1].

either at BCDCF or any other facility.  [Id. at 10].  Plaintiff claims that he did not file a grievance because he "was only at BCDCF for two days" and the "officers refused to communicate with [him] when they [made] their round check."[7]  [Id. at 11].  There is no forecast of evidence, however, that Plaintiff requested a grievance form or was denied access to submit a grievance.

## IV.  DISCUSSION

### A.  Failure to Exhaust Administrative Remedies

Defendants argue that the Plaintiff failed to exhaust his administrative remedies prior to filing this action and, therefore, his Complaint should be dismissed pursuant to the Prison Litigation Reform Act ("PLRA").  [Doc. 30 at 2, 14-17].

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing an action under § 1983 or under other federal law.[8]  42 U.S.C. § 1997e(a).  The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison

---

[7] At his deposition, Plaintiff testified that he knew that BCDCF had a grievance policy for inmates, but he did not file a grievance because the officer would not talk to him or let him have paper.  [Doc. 30-3 at 24-25].

[8] The exhaustion requirement applies with equal force to claims brought under the ADA and the Rehab Act.  See Fauconier v. Clarke, 966 F.3d 265, 274 (4th Cir. 2020). ("[W]e conclude that [plaintiff's] ADA claim, brought under a federal statue and challenging the enforcement of prison employment policies, was subject to the PLRA's exhaustion requirement.").

conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. 534 U.S. 516, 532 (2002). The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action to further the efficient administration of justice. Id.

In Woodford v. Ngo, the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law . . . requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). Further, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524). Finally, it is well-settled that a prisoner may not exhaust his administrative remedies during the pendency of a Section 1983 action; rather, he must fully exhaust all steps of

the administrative process <u>before</u> filing his lawsuit. <u>See</u> <u>Germain v. Shearin</u>, 653 Fed. Appx. 231, 234 (4th Cir. 2016); <u>French v. Warden</u>, 442 F. App'x 845, 846 (4th Cir. 2011).

A prisoner, however, "need not exhaust remedies if they are not 'available.'" <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1855 (2016) (quoting 42 U.S.C. § 1997e(a)). An administrative remedy is not "available" if a prisoner, "through no fault of his own, was prevented from availing himself of it." <u>Moore v. Bennette</u>, 517 F.3d 717, 725 (4th Cir. 2008). A remedy is unavailable (1) where the procedure operates as a simple dead end because officials are unable or consistently unwilling to provide any relief to aggrieved inmates; (2) where the grievance process itself is so incomprehensible that no ordinary prisoner can discern or navigate it; and (3) where administrators prevent inmates from availing themselves of remedies by way of machination, misrepresentation , or intimidation. <u>Ross</u>, 136 S. Ct. at 1858-60. Transfer to another facility, however, does not affect a prisoner's obligation to exhaust his administrative remedies before filing suit. <u>Jackson</u> <u>v. Studel</u>, No. 3:10-cv-177-MU-2, 2010 WL 1689095, at *2 (W.D.N.C. Apr. 20, 2010) (string cite omitted).

Here, the uncontroverted forecast of evidence shows that there was a grievance policy at the BCDCF, that Plaintiff never asked for a grievance

form while there or to submit a grievance, and that Plaintiff never submitted a grievance related to the facts at issue here while at BCDCF or elsewhere. While Plaintiff claims he was refused paper and pen during his short stay at BCDCF, he has forecast no evidence that the grievance procedure was unavailable to him.  See Ross, 136 S. Ct. at 1858-60.

Plaintiff, therefore, has not presented a sufficient forecast of evidence to survive Defendants' Motion for Summary Judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (the plaintiff can survive a motion for summary judgment by providing sufficient evidence so that "a reasonable jury could return a verdict for [the plaintiff].")  Accordingly, the Defendants' Motion for Summary Judgment will be granted on this ground.  Because dismissals based on the failure to exhaust administrative remedies are without prejudice, the Court will also address the other grounds for summary judgment asserted by Defendants.  See Dillard v. Anderson, No. 2:13-CV-31-FDW, 2010 WL 9553022, at *2 n.2 (W.D.N.C. Sept. 6, 2010) (Whitney, C.J.). ("A dismissal for failure to exhaust administrative remedies is without prejudice.").

### B.    First Amendment

Plaintiff claims that his rights under the First Amendment were violated because Defendants Bollinger and Marshall denied him use of the TTY

telephone. Prisoners generally have a First Amendment right "to communicate with persons outside prison walls." Valdez v. Rosenbaum, 302 F.3d 1039, 1048 (9th Cir. 2002). "Use of a telephone provides a *means* of exercising this right." Id. A prison regulation that impinges on an inmate's constitutional right "is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 92, 107 S. Ct. 2254 (1986). In conducting the "reasonableness" inquiry, Turner instructs consideration of four factors: (1) whether there is a valid, rational connection between the restriction and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether accommodating the asserted constitutional right will have a significant negative impact on prison guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are obvious, easy alternatives to the restriction showing that it is an exaggerated response to prison concerns. Id. at 89-90.

Here, Plaintiff complains that he was denied access to a TTY telephone. The forecast of evidence shows, however, that he was never denied access to a telephone while in the holding cell. Rather, Plaintiff was made to wait his turn to use the telephone and Plaintiff simply wanted access to the phone before the circumstances safely permitted. Furthermore, while

Plaintiff was denied access to a telephone when he was housed in a segregation cell for less than two days, prison policy precluded segregation inmates from having phone access. Restricting phone use by segregation inmates certainly advances "legitimate penological interests." See Turner, 482 U.S. at 92. Allowing segregation inmates like Plaintiff phone access would present obvious unnecessary safety and prison resource issues. As such, no genuine issue of material fact remains on Plaintiff's First Amendment claim. The Court will, therefore, grant Defendants' motion for summary judgment on this claim with prejudice.

### C. Eighth Amendment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319 (1986). To establish an Eighth Amendment claim, an inmate must satisfy both an objective component–that the harm inflicted was sufficiently serious–and a subjective component–that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). In adjudicating an excessive force claim, the Court must consider such factors as the need for the use of force, the relationship between that need and the amount of force used, the extent of the injury

inflicted, and, ultimately, whether the force was "applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21.

Furthermore, the Supreme Court has made clear that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, 130 S. Ct. 1175, 1178-79 (2010).

The forecast of evidence here is insufficient to show that Defendant Marshall used excessive force on Plaintiff. At most, Defendant Marshall pushed Plaintiff to the wall of a padded cell and deployed a short burst of pepper spray directed at the Plaintiff's eyes. The forecast of evidence shows that Defendant Marshall took this action when Plaintiff had raised his right hand from behind his back after his right handcuff was removed in a manner Plaintiff acknowledges could have been perceived as threatening. This minimal response by Marshall to regain control of a potentially combative inmate does not constitute excessive force. See Whitley, 475 U.S. at 320-21. The Court will, therefore, dismiss Plaintiff's Eighth Amendment claim against Defendant Marshall with prejudice.

As to Defendant Bollinger, however, the result is different. The forecast of evidence, in the light most favorable to Plaintiff as the non-

movant, shows that once Plaintiff was in the padded cell and after Marshall deployed pepper spray on Plaintiff, Bollinger slammed Plaintiff's head against the wall, slapped and punched the side of Plaintiff's head, and stomped and kicked Plaintiff's left leg and feet while Plaintiff was on the floor. The forecast of evidence also shows that Bollinger applied a pressure technique behind Plaintiff's left ear. As such, there remain genuine issues of material fact as to whether Bollinger's use of force on Plaintiff was excessive. A reasonable juror may find that such force was used maliciously or sadistically for the purpose of causing harm, rather than to maintain or restore discipline. The Court, therefore, cannot dismiss Plaintiff's Eighth Amendment claim against Defendant Bollinger with prejudice.

## D. ADA Claim

Plaintiff's ADA claim is based on the alleged denial of a TTY telephone. [Doc. 1 at 4; <u>see</u> Doc. 1 at 6]. Under Title II of the ADA, "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.

To establish a prima facie face under Title II of the ADA, a plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services,

programs, or activities for which he was otherwise qualified; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. Miller v. Hinton, 288 Fed. App'x 901, 902 (4th Cir. 2008) (citations omitted). States are obligated to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities. 42 U.S.C. § 12131(2). The duty of reasonable accommodation, however, must also take into account whether the institution's actions are related to legitimate penological interests. See Turner, 482 U.S. at 89; Tanney v. Boles, 400 F.Supp.2d 1027, 1050 (E.D. Mich. 2005) (noting that courts have applied Turner to ADA and Rehab Act claims). A plaintiff must also establish an actual injury from any alleged ADA or Rehab Act violation. See Rosen v. Montgomery Cty. Md., 121 F.3d 154, 158 (4th Cir. 1997).

The forecast of evidence here is insufficient to support a finding that Plaintiff was denied an accommodation on the basis of his disability. The accommodation for Plaintiff's disability, the TTY telephone, was readily available at BCDCF and located in the same place as the traditional telephone. Plaintiff had even used it on a previous occasion without issue. Plaintiff simply wanted access to the TTY telephone before it was his turn to use it and before Defendants could safely allow him to do so. As such, there

19

is no genuine issue of fact on Plaintiff's ADA claim and it will be dismissed with prejudice as to all Defendants.

### E.     Rehab Act Claim

Plaintiff's Rehab Act claim is based also on the alleged denial of a TTY telephone.  [Doc. 1 at 4; <u>see</u> Doc. 1 at 6].  The Rehabilitation Act provides that "no otherwise qualified individual with a disability … shall, solely by reason of [his] disability, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The analysis under the Rehab Act is generally the same as under the ADA.  <u>Freilich v. Upper Chesapeake Health, Inc.</u>, 313 F.3d 205, 214 (4th Cir. 2002).  Claims under the Rehab Act, however, require a showing of discrimination "solely by reason of" disability, 29 U.S.C. § 794(a), while under the ADA, a plaintiff must only show discrimination "by reason of" disability, 42 U.S.C. § 12132.  As such, the causation standards are "significantly dissimilar."  <u>Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 498 n. 17 (4th Cir. 2005) (citation omitted).  To sustain a claim under the Rehab Act, a plaintiff must also show that the program or activity in question receives federal financial assistance.  <u>Thomas v. The Salvation Army Southern Territory</u>, 841 F.3d 632, 641 (4th Cir. 2016).

Here, because the forecast of evidence is insufficient to sustain Plaintiff's ADA claim, Plaintiff's claim under the Rehab Act also fails. See Wicomico Nursing Home v. Padilla, 910 F.3d 739, 751 (4th Cir. 2018) (dismissing the plaintiff's Rehab Act claim because the plaintiff failed to state a viable ADA claim). Moreover, Plaintiff failed to plead, and the forecast of evidence does not support, that Defendant BCDCF, or any of its programs or activities, received federal funds. Plaintiff's Rehab Act claim, therefore, also fails for this reason.[9] As such, the Court will dismiss Plaintiff's Rehab Act claim with prejudice as to all Defendants.

### F.    Fourteenth Amendment[10]

To establish an equal protection violation, Plaintiff first must demonstrate that he has been treated differently from others with whom he is similarly situated, and that the unequal treatment was the result of intentional or purposeful discrimination. Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). In doing so, the plaintiff must set forth "specific, non-conclusory factual allegations that establish an improper [discriminatory]

---

[9] Furthermore, the ADA and Rehab Act do not allow claims against government officials in their individual capacities, in any event. Baird ex. Rel. Baird v. Rose, 192 F.3d 462, 472 (4th Cir. 1999). As such, Plaintiff's individual capacity claims against Bollinger and Marshall under these provisions would be dismissed, in any event.

[10] Based on the nature of the facts alleged, the Court assumes that Plaintiff intended to implicate the Fourteenth Amendment's Equal Protection Clause.

motive." Williams v. Hansen, 326 F.3d 569, 584 (4th Cir. 2003) (quoting Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir. 2001)).

Plaintiff's Fourteenth Amendment claim is based on the acts that allegedly deprived Plaintiff of his rights under the ADA and the Rehab Act. Again, the forecast of evidence does not show that Plaintiff was discriminated against because of his disability. Plaintiff's Fourteenth Amendment claim, therefore, fails and will be dismissed with prejudice.

### G.    Qualified Immunity

Defendants Bollinger and Marshall also claim that they are entitled to qualified immunity on Plaintiff's individual capacity § 1983 claims. [Doc. 30 at 23]. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and

protects all but the plainly incompetent or those who knowingly violate the law." <u>Smith v. Ray</u>, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Here, because Plaintiff has not forecasted evidence that Defendant Marshall violated a constitutional right, Defendant Marshall is entitled to qualified immunity on all Plaintiff's individual capacity claims. Defendant Bollinger, however, is entitled to such immunity only on Plaintiff's individual capacity claims under the First and Fourteenth Amendments because an issue of fact remains as to whether he used excessive force on Plaintiff under the Eighth Amendment. As such, the Court will grant Defendants' Motion for Summary Judgment based on qualified immunity accordingly.

## IV. CONCLUSION

In sum, the Court will dismiss Plaintiff's Eighth Amendment claim against Defendant Bollinger without prejudice and the remainder of Plaintiff's claims against all Defendants with prejudice as herein provided.

## O R D E R

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment [Doc. 29] is **GRANTED.** Plaintiff's excessive force claim against Defendant Bollinger under the Eighth Amendment is hereby **DISMISSED**

**WITHOUT PREJUDICE** and Plaintiff's remaining claims are hereby **DISMISSED WITH PREJUDICE**.

The Clerk is instructed to correct the docket in this matter to reflect Defendant FNU Bollinger's true full name, Jamison Bollinger, and Defendant FNU Marshall's true full name, David Marshall.

The Clerk is instructed to terminate this action.

**IT IS SO ORDERED**.

Signed: February 16, 2021

Martin Reidinger
Chief United States District Judge